| 9.  | MI-J62-MY | 8 | $330 | $2,640 |
|-----|-----------|---|------|--------|
| 11. | MI-J6Y-MY | 2 | $330 | $660 |

In addition, further Vicor products were requested, as well as additional product information on the SDID product QRS11-00100-100.

53.     On February 5, 2004, UCA 2 telephoned number (626) 437-2370. The phone call was recorded. The individual who answered identified himself as CHU. UCA 2 confirmed that he received CHU's fax with the purchase order. UCA 2 discussed the contents of the fax CHU sent to the SAC Boston U/C Company. CHU indicated that the new item that ZHU had requested was the SDID GyroChip.

54.     UCA 2 stated that he could quote CHU a price of $2,600.00 per unit for the GyroChip identified as BEI SYSTRON DONNER QRS1100100. CHU informed UCA 2 that he and ZHU were coming to Boston on Monday, February 9, 2004 at 7:00 a.m., and that they were flying on United Airlines. CHU further stated that he and ZHU would not be staying in a hotel while in Boston, but were flying out later that day. CHU stated that he was busy and asked if he could call back. UCA 2 asked CHU to fax a purchase order including the newly requested parts.

55.     On February 6, 2004, UCA 2 telephoned (626) 437-2370. The individual answering the telephone identified himself as CHU. UCA 2 asked if the purchase order had been faxed, and CHU stated that he was unfamiliar with anything related to the actual business transaction and that he was just an interpreter. UCA 2 confirmed with CHU that ZHU had agreed upon the quoted prices and restated that ZHU had to fax over a purchase order. UCA 2 requested the exact model of the SDID GyroChips ZHU wanted. CHU stated that he would check with ZHU. UCA 2 stated that the price of $2,600.00, which was quoted to ZHU

-21-

previously, was for the new model of the GyroChips, model 101. CHU again stated that they would meet on Monday, February 9, 2004.

56.    On February 9, 2004, at approximately 5:45 a.m., Special Agents from the SAC, Boston initiated surveillance at Logan International Airport. At approximately 6:30 a.m. two Asian males arrived via United Airlines Flight 180, a non-stop, overnight flight from Los Angeles. The two males were observed entering a transportation van with a logo designating it as transportation for Alamo Rental Car. The van was surveilled as it departed the terminal area and transported the occupants to the Alamo Rental Car Agency, located at 2 Tomahawk Drive, East Boston. The two males were observed departing the Alamo transportation van and entering the rental agency. Shortly after entering the rental agency, the two males were observed departing the rental agency and entering into a late model sports utility vehicle.

57.    Special Agents from the SAC, Boston then entered the Alamo rental agency and obtained a copy of the rental agreement executed by the two males. The rental agreement listed the renter as John CHU, Los Angeles, California.

58.    On February 9, 2004, UCA 2 telephoned (626) 437-2370. The phone call was recorded. The individual answering the telephone identified himself as CHU. CHU stated that he and ZHU were already in Boston. UCA 2 gave CHU directions to the location of the undercover meeting.

59.    Later on February 9, 2004, UCA 2 met with ZHU Zhaoxin and John CHU in Cambridge, Massachusetts. The meeting was consensually monitored and recorded. The meeting began at approximately 9:52 a.m. CHU served as a Chinese translator for ZHU.[8] CHU

---

[8]    The meeting was consensually recorded and the Chinese language conversations between ZHU and CHU have been translated. I have reviewed the transcipts of the translated

acknowledged working for ZHU and Hong Kong New Crystal International. During the meeting, CHU, after discussion with ZHU in Chinese, acknowledged that the Vicor power converters were controlled for export by the DOS, and further acknowledged that the DOS would deny any export license application for such items for end use in China. Discussions in Chinese between CHU and ZHU were translated and revealed that ZHU also acknowledged that the DOS controlled the items for export, and ZHU further acknowledged that the DOS would never grant an export license to his company. CHU, after discussion with ZHU in Chinese, stated that they (ZHU and Hong Kong New Crystal) would not apply for an export license from the U.S. Government, and further acknowledged that it was illegal to export the Vicor products to China without an export license. Translated conversations between CHU and ZHU also confirmed that ZHU was aware that it would be illegal to export the Vicor products to China without an export license. CHU, after discussion with ZHU in Chinese, agreed to place an order for approximately $163,000.00 of the Vicor products discussed. CHU, again after discussion with ZHU in Chinese, indicated that in order to minimize detection by authorities, they would store the Vicor products for approximately 2 to 3 months in the U.S., and make several smaller shipments to various addresses and third countries. CHU stated that he would not have a problem shipping the Vicor products from the third countries to the ultimate destination of China. Additionally CHU, after discussion with ZHU in Chinese, stated that after this shipment of Vicor products were shipped successfully, they were interested in placing an additional order for some SDID GyroChips. CHU, after discussion with ZHU in Chinese, acknowledged that they both understood the DOS controlled the GyroChips for export. As part of the negotiations for the Vicor products, ZHU

conversations.

-23-

and CHU agreed to submit a 30% deposit upon placing the purchase order. In addition to the SDID products, CHU, after discussion with ZHU in Chinese, stated they were interested in ordering products from a company identified as "Triquint". CHU stated that he had recently opened a branch office of Hong Kong New Crystal in the Los Angeles area for ZHU. CHU and ZHU agreed to accept delivery of the product COD in the Boston area. UCA 2, ZHU and CHU left the office complex at approximately 11:27 a.m. and traveled to a restaurant in Cambridge, where they had lunch and continued with the meeting. Translations of the Chinese discussion between ZHU and CHU revealed that ZHU was aware of the risk involved in the transaction involving the Vicor parts, and ZHU stated that if something bad happened to ZHU, CHU or UCA 2, they should not get the other individuals involved. UCA 2 asked ZHU and CHU how they were going to get the product back to China, to which ZHU replied in Chinese to CHU that he was going to ship some in Boston and some in Los Angeles, that he was going to "use the method like moving by ants, one by one." ZHU further stated in Chinese that he would mail the items to Taiwan, Singapore, or Canada, that he would mail the items to a third country and then transfer them to China. ZHU further stated in Chinese "at most, I pay a little more shipping." UCA 2 asked CHU if they would have any problem transshipping the product through a third country to China. ZHU stated that he would have no problem. ZHU further stated in Chinese to CHU for CHU not to mention anything to UCA 2 about "our (ZHU and CHU's) company in Los Angeles." CHU asked UCA 2 to provide them (ZHU and CHU) with a business report on the SAC Boston U/C Company and also with UCA 2's driver's license as proof of identification. UCA 2 stated that he would fax the information to CHU. UCA 2, ZHU and CHU departed the restaurant at approximately 1:10 p.m.

-24-

60.    On February 10, 2004, BAI contacted the SAC Boston U/C Company via the e-mail address bai222@hotmail.com (hereinafter the "hotmail address").  BAI requested that UCA 2 contact him via the hotmail address.  Attached to this e-mail was the purchase order for the Vicor power products from Hong Kong New Crystal International Co., Ltd.  The following contact information was provided:

| | |
|---|---|
| P/O No: | NCB0402102 |
| Ship To Address: | 3/F No 16 Shantong New Village Taipo N.T. Hong Kong |
| Billing Address: | 3/F No 16, Shantong New Village Taipo N.T. Hong Kong |
| Attn: | Mr. Yang Shanbiao |
| Tel: | 852-29775578 |
| Fax: | 852-25390293 |

Hong Kong New Crystal International Co., Ltd.

| | |
|---|---|
| Tel: | 86-755-83665581 |
| Fax: | 86-755-83665098 |

| | Product Number | Quantity ordered | Price per unit | Total Price |
|---|---|---|---|---|
| 1. | MI-J20-MY | 100 | $270 (U.S.) | $27,000.00 (U.S.) |
| 2. | MI-J20-MZ | 50 | $280 | $14,000 |
| 3. | MI-J22-MZ | 100 | $250 | $25,000 |
| 4. | MI-220-MY | 50 | $330 | $16,500 |
| 5. | MI-J21-MY | 30 | $330 | $ 9,900 |
| 6. | MI-J21-MZ | 150 | $250 | $37,500 |
| 7. | MI-260-MW | 20 | $430 | $ 8,600 |
| 8. | MI-B60-MW | 20 | $400 | $ 8,000 |
| 9. | MI-J62-MY | 40 | $330 | $ 13,200 |
| 10. | MI-J6Y-MY | 10 | $330 | $ 6,600 |
| | Total: | | | $163,000.00 (US) |

61.    Later on February 10, 2004, BAI contacted the SAC Boston U/C Company via his hotmail address.  BAI requested a sales quote on the following products:

| | | |
|---|---|---|
| 1. | TGA83-SCC | 1000 pieces |
| 2. | TGP6336-EEU | 1000 pieces |

3.   TGL6425-SCC          1500 pieces
4.   TGS8122-SCC          1500 pieces

62.   Still later on February 11, 2004, UCA 2 contacted BAI at his hotmail address.

UCA 2 confirmed receipt of BAI's order no: NCB0402102.  UCA 2 attached a sales invoice

from the SAC Boston U/C Company.  The sales invoice included the following information:

Sales invoice #:     SW13721104 (Reference PO NO NCB0402102)
Invoice To:          Hong Kong New Crystal International Co., Ltd.
                     3/F No. 16, Shantong New Village Taipo
                     N.T. Hong Kong
                     Tel:    852-29775578
                     Fax:    852-25390893
                     Attn:   Sunny Bai
                     New Crystal International
                     Los Angeles, California
                     Attn:   John CHU

| | Product Number | Quantity ordered | Price per unit | Total Price |
|---|---|---|---|---|
| 1. | MI-J20-MY | 100 | $270 (U.S.) | $27,000.00 (U.S.) |
| 2. | MI-J20-MZ | 50 | $280 | $14,000 |
| 3. | MI-J22-MZ | 100 | $250 | $25,000 |
| 4. | MI-220-MY | 50 | $330 | $16,500 |
| 5. | MI-J21-MY | 30 | $330 | $9,900 |
| 6. | MI-J21-MZ | 150 | $250 | $37,500 |
| 7. | MI-260-MW | 20 | $430 | $8,600 |
| 8. | MI-B60-MW | 20 | $400 | $8,000 |
| 9. | MI-J62-MY | 40 | $330 | $13,200 |
| 10. | MI-J6Y-MY | 10 | $330 | $6,600 |

Total:                                                      $163,000.00 (US)

Payment Terms:       30% due immediately       Amt due:     $48,900.00 (US)

Balance due upon delivery of items COD Boston, Massachusetts:  $114,100.00 (US)

Included in the correspondence was the SAC Boston U/C Company banking information and

wire instructions.  The following statement was included on the bottom of the sales invoice:

"These items are subject to U.S. export controls. Export from the U.S., diversion, or re-export without proper U.S. government authorization is a violation of U.S. Export Law."

63. On the same day, the sales order and banking information listed above was also sent via fax to John CHU at fax number 626-300-8188.

64. On February 17, 2004, BAI contacted the SAC Boston U/C Company via his hotmail address. BAI stated that he had wired the down payment to the SAC Boston U/C Company. BAI included an attachment to the e-mail listing the information related to the wire transfer. The attachment listed the following information:

Sender:

| | |
|---|---|
| Name: | Nanyang Commercial |
| ABA#: | 121039484 |
| Reference #: | 04021807443916 |
| Received from: | Bank of China |
| By order of: | Cao Shijun |
| Amount: | $48,882.00 |

65. On February 17, 2004, BAI contacted the SAC Boston U/C Company via his hotmail address. BAI requested the following, previously mentioned in one of his February 10 e-mails:

| | | |
|---|---|---|
| 1. | TGA9083-SCC | 1200 pieces |
| 2. | TGP6336-EEU | 1200 pieces |
| 3. | TGL6425-SCC | 1200 pieces |
| 4. | TGS8122-SCC | 2000 pieces |

Also in this e-mail, BAI stated that a company called Triquint manufactured the products, with an internet address www.triquint.com.

66. Triquint has been further identified as: Triquint Semiconductor, 500 West Renner Road, Richardson, TX 75080. Telephone: (972) 994-8656; Fax: (972) 994-8504. The

investigation has revealed that item 1 (TGA9083) is controlled for export by the DOS, and

therefore would require an export license for export to China. Items 2 (TGP6336) and 4

(TGS8122) are controlled for export by the DOC, and also therefore require an export license for

export to China.

67.    On February 17, 2004, the SAC Boston U/C Company contacted BAI via his

hotmail address. Attached to this e-mail was a quotation for the Triquint products, which was

sent via fax and e-mail to BAI and CHU. The sales quotation listed the following information:

Date:          February 17, 2004
Quotation to:  Hong Kong New Crystal International Co., Ltd.
               3/F No. 16, Shantong New Village Taipont
               N.T. Hong Kong
               Tel:   852-29775578
               Fax:   852-25390893
               Attn:  Sunny Bai

               New Crystal International
               Los Angeles, California
               Attn:  John Chu

        Triquint products:

| | | | | |
|---|---|---|---|---|
| 1. | TGA9083-SCC | 1200 pieces | USD | $205,200.00 |
| 2. | TGP6336-EEU | 1200 pieces | USD | $132,000.00 |
| 3. | TGL6425-SCC | 1200 pieces | USD | $86,400.00 |
| 4. | TGS8122-SCC | 2000 pieces | USD | $32,000.00 |
| | | | Total: | $437,600.00 |

Payment terms:      30% due immediately           $131,280.00

Balance due upon delivery COD Boston             $306,320.00

The following statement was included on the bottom of the sales invoice: "These items are

subject to U.S. export controls. Export from the U.S., diversion, or re-export without proper U.S.

-28-

government authorization is a violation of U.S. Export law."

68.    On February 18, 2004, BAI contacted the SAC Boston U/C Company via his hotmail address. In this e-mail BAI stated that he had attached a purchase order for the Triquint products. The attachment failed to transmit.

69.    Also on February 18, 2004, the SAC Boston U/C Company contacted BAI via his hotmail address. UCA 2 stated that he had not received the purchase order for the Triquint products. Also, UCA 2 reviewed that the TGA9083 required a DOS export license, and model numbers TGP6336 and TGS8122 required a DOC export license. UCA 2 requested that BAI contact ZHU and CHU to determine how they wanted to handle the export. UCA 2 further stated that it had been determined that because of the restrictions of U.S. export laws, the SAC Boston U/C Company would deliver the Vicor products to ZHU and CHU in Boston, and they would handle the export. UCA 2 further stated that the Triquint products could be handled the same way.

70.    Also on February 18, 2004, BAI contacted the SAC Boston U/C Company via his hotmail address. Attached to the e-mail was a purchase order listing the following information:

| | P/O No: | NCBO402182 | | |
|---|---|---|---|---|
| 1. | TGA9083-SCC | 1000 pieces | USD | $171,000.00 |
| 2. | TGP6336-EEU | 1000 pieces | USD | $110,000.00 |
| 3. | TGL6425-SCC | 1000 pieces | USD | $57,000.00 |
| 4. | TGS8122-SCC | 1500 pieces | USD | $22,500.00 |

Total: $360,500.00

Sunny Bai
Tel:            86-755-83665581
Fax:           86-755-83665098
Cell Phone:    86-137-146-2297
E-mail:        xinjing@segit.com.cn

-29-

71.    Also on February 18, 2004, a wire transfer in the amount of $48,882.00, representing what I believe to be the down payment on the Vicor products, was received in the SAC Boston U/C Company bank account. The wire transfer originated with the Bank of China.

72.    On February 26, 2004, BAI contacted the SAC Boston U/C Company via his hotmail address. BAI stated that he was told that the Triquint parts were sensitive and difficult to buy. BAI further wrote: "I wonder whether you are not working for FBI or CIA, because you can get these parts easily."

73.    On February 26, 2004, BAI contacted the SAC Boston U/C Company via his hotmail address. BAI requested lead (delivery) time on the Triquint parts.

74.    On February 27, 2004, the SAC Boston U/C Company contacted BAI via his hotmail address. UCA 2 stated that the Triquint products are sensitive, especially for export to China. In addition, UCA 2 requested that BAI not reference the government agencies he referenced in his e-mail of February 26, 2004, as it would draw unwanted attention to the transaction.

75.    On March 17, 2004, BAI contacted the SAC Boston U/C Company via his hotmail address. BAI requested the following Vicor products:

| | | |
|---|---|---|
| 1. | MI-J20-MZ | 20 units |
| 2. | MI-J60-MZ | 20 units |
| 3. | MI-260-MW | 20 units |
| 4. | MI-J20-MI | 20 units |
| 5. | MI-J20-MI | 80 units |
| 6. | MI-J22-IZ | 40 units |
| 7. | MI-J22-MZ | 160 units |
| 8. | MI-RAM-M1 | 120 units |

76.    On March 18, 2004, I contacted Keith Nardone, Manager Military Sales and

Marketing, Vicor Corporation, Andover, Massachusetts. I requested information on the above

listed items. Nardone stated that item number 5 was not a valid item, and was most likely the

MI-J20-MY. Nardone provided sales information on the above listed items.

77.    On March 18, 2004, UCA 1 contacted BAI via his hotmail address. UCA 1 stated

that item number 5 was incorrect, and must be MI-J20-MY. UCA 1 provided sales information:

|    | Part Number | Quantity | Price per Unit | Total |
|----|-------------|----------|----------------|-------|
| 1. | MI-J20-MZ   | 20 pcs   | $280.00        | $5,600.00 |
| 2. | MI-J60-MZ   | 20 pcs   | $280.00        | $5,600.00 |
| 3. | MI-260-MW   | 20 pcs   | $430.00        | $8,600.00 |
| 4. | MI-J20-IZ   | 20 pcs   | $165.00        | $3,300.00 |
| 5. | MI-J20-MI   | 80 pcs   | $270.00        | $21,600.00 |
| 6. | MI-J22-IZ   | 40 pcs   | $165.00        | $6,600.00 |
| 7. | MI-J22-MZ   | 160 pcs  | $250.00        | $40,000.00 |
| 8. | MI-RAM-M1   | 120 pcs  | $139.00        | $16,680.00 |
|    | Total Price: |         |                | $107,980.00 |

78.    On March 19, 2004, UCA 2 contacted BAI at telephone number 011 86 137146

22977. The person on the receiving end of the phone call identified himself as BAI. BAI stated

that he needed a quotation for a previously-discussed Perking Elmer part, and that he needed the

product to be delivered in one week. BAI further stated that the product was for a customer in

Mainland China. UCA 2 inquired about the second Vicor order, and BAI stated that once the

product was delivered to ZHU and CHU, they would place a purchase order for the second

shipment. UCA 2 further stated that the first order would be ready for delivery during either the

first or second week of April, 2004. UCA 2 confirmed with BAI that ZHU and CHU would

personally accept delivery of the product in Boston. BAI stated that the product would be

shipped to Hong Kong and then onward to Mainland China. BAI further stated that ZHU was

-31-

currently in Mainland China.

79.    On March 22, 2004, the SAC Boston U/C Company contacted BAI via his hotmail address. UCA 1 stated that the price per unit for the Perking Elmer product was $365.00 for a total price of $18,250.00. UCA 1 further stated that the manufacturer required 6 to 8 weeks for delivery.

80.    Later on March 22, 2004, BAI contacted the SAC Boston U/C Company via his hotmail address. BAI requested an earlier delivery time for the product, and said that ZHU would travel to America to pick the product up.

81.    Still later on March 22, 2004, the SAC Boston U/C Company contacted BAI via his hotmail address. UCA 1 stated that unfortunately, Perkin Elmer could not provide that product any sooner then the six weeks initially quoted.

82.    On March 24, 2004, the SAC Boston U/C Company contacted BAI via his hotmail address. UCA 1 quoted the following prices on the Vicor products:

|   | Item | qty | price/unit | total |
|---|------|-----|-----------|-------|
| 1. | MI-M2L-MU | 10 | $850.00 | $8,500.00 (U.S.) |
| 2. | MI-J20-MY | 20 | $270.00 | $5,400.00 |
| 3. | MI-A22-MU | 5 | $180.00 | $  900.00 |
|   | Total: |   |   | $14,800.00 |

UCA 1 further quoted a delivery time of 6 to 8 weeks.

83.    On March 25, 2004, BAI contacted the SAC Boston U/C Company via his hotmail address. BAI stated that his customers had placed many orders with him, but he wanted to wait until they received the first Vicor order.

-32-

## OVERT ACTS

### C.    The TWT Negotions

84.    Also on March 25, 2004, BAI contacted the SAC Boston U/C Company via his hotmail address.  BAI requested the following products:

VTU5192A7A or VTV5192A7A    30 pcs

BAI further wrote that more information could be found about the above products on the internet web site of www.cpii.com.  Publicly available information has revealed that www.cpii.com is the corporate internet address for the company: Communication and Power Industries M.P. ("CPI"), Hansen Way, Palo Alto, CA 94303; Telephone: (650) 846-3900; Fax: (650) 494-8779.

85.    On March 30, 2004, BAI contacted the SAC Boston U/C Company via the e-mail address lucky@963.net (hereinafter, the "963.net address").  BAI requested an update on his inquiry of the CPI product, VTU5192A7A.  BAI listed the following contact information:

Tel:    86-755-83665581
Fax:    86-755-83665098
Cell:    86-1300-883-9800

Information received from the manufacturer indicates that the product listed above, the VTU5192A7A, is a "multi octave" traveling wave tube (TWT).  The manufacturer further stated that the product is listed on the Munitions List in Category XI(c), and is controlled for export by the DOS.  A review of the Automated Export System revealed that Communications and Power Industries, 811 Hansen Way, Palo Alto, CA, is registered with the DOS DDTC as a manufacturer and/or exporter of defense articles.  A review of DOS-issued export licenses issued to CPI revealed numerous export licenses for the export of TWTs.[9]

_____

[9]    ICE has received a second level review of these products, confirming that they are Munitions List items.

86.    On April 2, 2004, BAI contacted the SAC Boston U/C Company via the 963.net address. BAI requested when the first shipment of Vicor products would be ready for delivery.

87.    On April 5, 2004, the SAC Boston U/C Company contacted BAI at the 963.net address. UCA 1 stated that he would contact his associate at Vicor and determine when the first lot would be ready for delivery. UCA 1 further stated that he would research the CPI product and provide a sale and delivery quote shortly.

88.    On April 6, 2004, the SAC Boston U/C Company contacted BAI at the 963.net address. UCA 1 stated that the first shipment of Vicor products would be available the week of April 19, 2004. UCA 1 further stated that the balance of $114,100.00 would be payable upon delivery in a certified bank check.

89.    On April 7, 2004, the SAC Boston U/C Company contacted BAI via the 963.net address and sent a copy to his hotmail address. UCA 1 stated that the price per unit on the CPI product, the VTU-5192A7A would be $40,975.00 per unit for a total of $1,229,250.00.

90.    On April 8, 2004, BAI contacted the SAC Boston U/C Company via the 963.net address. BAI stated that the quoted price for the CPI product was too high and asked if it could be reduced by 25%. BAI further stated that they would be purchasing 50 pieces.

91.    Also on April 8, 2004, UCA 1 contacted BAI via the 963.net address. In this e-mail, UCA 1 wrote that BAI's customer's requested price of $20,000.00 per unit was far below the price for which CPI was currently marketing the product. UCA 1 wrote that he could reduce the price per unit to $35,000.00 per unit. UCA 1 further wrote that "as with the other items we have discussed, approvals will not be granted to export these items to mainland China. Delivery of these items (CPI TWTs) would be in the same manner as that of the Vicor products, payable

-34-

upon delivery in the U.S." UCA 1 further wrote that the first shipment of Vicor products (deliverable as per response to purchase order # NCB0402102 which was submitted by BAI on February 10, 2004) would be ready for delivery during the week of April 19, 2004.

92.    On April 8, 2004, BAI contacted the SAC Boston U/C company via the 963.net address. BAI stated that he would discuss the price of the CPI product with his customer.

93.    On April 13, 2004, the SAC Boston U/C company contacted BAI via the 963.net address. UCA 1 wrote that he would be receiving the Vicor shipment on April 20, 2004. UCA 1 further stated that as per the agreement on delivery, ZHU and CHU should make their travel arrangements to pick up the shipment during the week of April 19, 2004.

94.    Also on April 13, 2004, UCA 2 contacted CHU at telephone number 626-437-2370. The phone call was recorded, and UCA 2 recognized the voice as CHU. During the telephone call, UCA 2 stated that the Vicor product would be ready for delivery on April 20, 2004. UCA 2 requested that ZHU and CHU travel to Boston to pick up the product. UCA 2 further stated that the final payment would be required upon delivery of the product. CHU acknowledged that he would contact BAI to finalize travel arrangements.

95.    Later on April 13, 2004, CHU left a message on the SAC Boston U/C company cellular telephone. CHU was calling from the telephone number 626-437-2370. The phone call was recorded, and UCA 2 recognized the voice as CHU. CHU stated that he would be arriving in Boston on April 20, 2004, and that he would be arriving at 11:00 am. Chu requested that UCA 2 contact him at 626-437-2370.

96.    On April 14, 2004, UCA 2 contacted BAI at the 963.net address. UCA 2 wrote that he had spoken to CHU regarding delivery of the Vicor product. UCA 2 further stated that due to

-35-

the size of the CPI order, he could reduce the price per unit to $32,000.00.

97.    On April 15, 2004, UCA 2 contacted CHU at telephone number 626-437-2370. The phone call was recorded, and UCA 2 recognized the voice as CHU. CHU confirmed that he would be traveling to Boston on April 20, 2004. CHU stated that when he arrived in Boston, he would rent a car. CHU stated that he was traveling to Boston to check on the (Vicor) product, and that after he checked on the product, he would call BAI and have the final payment wired to the SAC Boston U/C company bank account. CHU stated that this would be done the same way it had been done the last time. CHU acknowledged that this first order was "sensitive". UCA 2 stated that due to the sensitivity of the products, the future sales would have to be completed in the same manner, as a domestic sale, and that CHU and ZHU would handle the export. CHU stated that he had read in the newspaper that the (US) government had "caught" twice as many people for this type of thing this year as they had the last year. CHU further stated that ZHU had "put him in front" of this. CHU further stated that he would rent a motel in the area to wait while the money was wired from BAI and ZHU.

98.    During the April 15, 2004 telephone call, CHU stated that he did not know if ZHU would be traveling to the U.S. for this meeting. CHU stated that he would inspect the product, and upon inspection, CHU would contact BAI in Hong Kong to request that final payment be wired as it had been before. CHU then stated that when the final payment was made, he, CHU, would pick up the product. UCA 2 stated that BAI had requested quotes on the SDID GyroChip, as well as the CPI TWTs. CHU acknowledged that the GyroChip and TWTs were very sensitive items.

99.    On April 16, 2004, UCA 1 contacted BAI via the 963.net address. UCA 1

-36-

discussed the price of the CPI part number VTU-5192A7A, and confirmed that the price per unit

was $32,000.00. UCA 1 further wrote that the manufacturer currently had two units in stock.

UCA 1 further wrote that, with respect to the final payment for the Vicor product, it would be

best if the funds were not transferred from Mainland China, as that might increase scrutiny of the

sale of the items.

100.    On April 16, 2004, Vicor Corporation, Andover, Massachusetts, at my request,

provided inoperable dc/dc power converters in the following amounts in response to a Purchase

Order issued by individuals at Hong Kong New Crystal:

| | | |
|---|---|---|
| 1. | MI-J20-MY | 100 |
| 2. | MI-J20-MZ | 50 |
| 3. | MI-J22-MZ | 100 |
| 4. | MI-220-MY | 50 |
| 5. | MI-J21-MY | 30 |
| 6. | MI-J21-MZ | 150 |
| 7. | MI-260-MW | 20 |
| 8. | MI-B60-MW | 20 |
| 9. | MI-J62-MY | 40 |
| 10. | MI-J6Y-MY | 10 |

101.    On April 19, 2004, BAI contacted the SAC Boston U/C company via the 963.net

address. BAI wrote that he had instructed CHU to inspect the parts on April 20, 2004. BAI

further requested that the TWT project not be discussed with CHU. BAI further wrote that,

regarding the TWT, "we" can buy the stock.

102.    Also on April 19, 2004, UCA 1 contacted BAI via the 963.net address. UCA 1

wrote that he would not discuss the TWTs with CHU. UCA 1 further wrote that he had received

the Vicor product  (as per BAI's P/O # NCB0402102) and that it was ready for inspection and

delivery to CHU. UCA 1 further wrote that the product could not be released until receipt of

-37-

final payment of $114,100.00 (US). UCA 1 further wrote that regarding the TWTs, the manufacturer had a limited supply of items, and requested an update on the $32,000.00 per unit price quote. UCA 1 further asked that if he could not discuss the TWT transaction with CHU, when ZHU would be available to discuss the TWT transaction.

103. Also on April 19, 2004, UCA 2 contacted CHU at telephone number 626-437-2370. The phone call was recorded, and UCA 2 recognized the voice as CHU. The person who answered the telephone was identified as CHU. In this telephone conversation, UCA 2 discussed with CHU arrangements for the final payment on the Vicor transaction. CHU acknowledged that it would take two to three days for the wire transfer to occur. CHU confirmed that he would be arriving in Boston on April 20, 2004, at approximately 11:00 a.m. CHU stated that he would rent a car, and would meet UCA 2 at the offices he had met him February 9, 2004.

104. On April 20, 2004, CHU left a voice mail message on the SAC Boston U/C company cellular telephone. The phone call was recorded, and the voice was identified as being CHU. CHU stated that he had arrived at the office building, and requested that UCA 2 contact him at telephone number 626-437-2370.

105. Later on April 20, 2004, UCA 2 attempted to contact CHU at telephone number 626-437-2370. The call went straight to voice mail, and an audio recording was made of the call. UCA 2 stated that he was just in a meeting, but would be ready to meet CHU in a few minutes. UCA 2 requested that CHU contact him on the SAC Boston U/C company cellular telephone.

106. Later on April 20, 2004, UCA 2 met with John CHU in Cambridge, Massachusetts. The meeting was consensually monitored and recorded. The meeting began at approximately 11:40 a.m. During the meeting, CHU inspected four boxes of Vicor products, and

-38-

compared the product against an e-mail he had in his possession. The e-mail was sent from the

963.net address, and referenced CHU's inspection of the Vicor products. The e-mail was dated

April 16, 2004. CHU counted the Vicor products and compared his count to the quantities listed

on the e-mail. The quantities listed on the e-mail were as follows:

| Product Number | | Quantity ordered |
|---|---|---|
| 1. | MI-J20-MY | 100 |
| 2. | MI-J20-MZ | 50 |
| 3. | MI-J22-MZ | 100 |
| 4. | MI-220-MY | 50 |
| 5. | MI-J21-MY | 30 |
| 6. | MI-J21-MZ | 150 |
| 7. | MI-260-MW | 20 |
| 8. | MI-B60-MW | 20 |
| 9. | MI-J62-MY | 40 |
| 10. | MI-J6Y-MY | 10 |

CHU examined each box, and counted the product contained within. While inspecting the Vicor

products, in response to a question from UCA 2, CHU stated he had spoken to BAI the previous

day. CHU stated that after he had completed inspection of the Vicor parts, he would call BAI,

and they (who I understand to refer to BAI and ZHU) would wire the final payment. CHU said it

would take approximately 48 hours for the funds to be transferred. CHU asked UCA 2 how

much it would cost to have the Vicor products delivered to Los Angeles. CHU placed markings

on the Vicor boxes to prevent anyone from opening the boxes following his inspection. CHU

presented UCA 2 with a business card reading:

Law Offices of Gang Jian SHU
328 South Atlantic Blvd., #105
Monterrey Park, CA 91754
Name: Li Li WANG, Attorney Assistant
26-289-7788
626-573-9968

-39-

The card also contained a hand written notation reading "641-7718". CHU requested that the Vicor product be delivered to the address on the card. CHU stated that he was going to attempt to contact ZHU and/or BAI later that evening around 8:00 pm, and would contact UCA 2. CHU stated that he may travel to New Jersey to visit with his sister. UCA 2 and CHU departed the office complex, and at approximately 12:32 p.m. walked to the MC$^2$ Restaurant, located in the Marriott Hotel, Cambridge, Massachusetts. During the lunch meeting, CHU stated that he had not spoken to ZHU for five days. CHU stated that he would ship the Vicor products through Central America, claiming that it was easy. CHU referenced an e-mail which he had received from BAI dated April 16, 2004. UCA 2 stated that he would like to speak with ZHU about the details of the export, that he was concerned about shipping the items on an aircraft. CHU stated that, if it were his choice, he would not ship the items via air. UCA 2 stated that they were both at risk in shipping these items, and that he did not want to take a chance and have "it" come back to him (UCA 2). CHU stated he had been to Central America several times, that he had connections there, and that he felt comfortable there. CHU stated he and some associates could drive the shipment to Central America and ship it from there. He and his associates always traveled in a group of four or five cars together. CHU further stated that his associates purchased used cars in the United States and then would drive them to Central America. UCA 2 asked CHU if he would ship the Vicor products directly to the P.R.C., or to Hong Kong first. CHU stated that he would send the items to Hong Kong first. CHU said that he would not ship them piece by piece, and asked UCA 2 to tell BAI and ZHU not to ship the product that way. UCA 2 quoted the shipping costs from Boston to Los Angeles at approximately $300.00. UCA 2 further stated that he did not want to be involved in shipping the products, that the responsibility

-40-