UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )

v.                        )

JOHN CHU (1),             )
ZHU ZHAOXIN (2) and       )
SUNNY BAI  (3)            )

**04** CR **1 0 1 5 6** WGY

CRIMINAL NO.

VIOLATION: 18 U.S.C. §371
(Conspiracy)

## INDICTMENT

**COUNT ONE:**      **(18 U.S.C. § 371 - Conspiracy)**

The Grand Jury charges that:

From a date unknown to the Grand Jury but not later than March 25, 2004, until May 6,

2004, at Boston, and elsewhere within and outside the District of Massachusetts,

JOHN CHU,  ZHU ZHAOXIN and SUNNY BAI,

defendants herein, did unlawfully, willfully, and knowingly combine, conspire, confederate and

agree with one another and with one or more other persons, known and unknown, to commit

offenses against the United States, to wit: to export defense articles or defense services

designated by the President under 22 U.S.C. § 2778(a)(1) without a license for such export, in

violation of 22 U.S.C. § 2778(b)(2) and (c).

Overt Acts

In furtherance of the conspiracy and to effect the objects thereof, the defendants

committed the following overt acts, among others, in the District of Massachusetts, and

elsewhere:

1.      On March 25, 2004, Defendant Sunny BAI, believed to reside in Shenzhen, a city

-1-

within Guangdong Province, P.R.C., contacted an uncover company established at the direction of the Boston Special Agent in Charge ("SAC"), Immigration and Customs Enforcement ("ICE"), an agency within the Department of Homeland Security. The undercover company is referred to herein as the "SAC Boston U/C Company." BAI contacted the SAC Boston U/C Company via the e-mail address: bai222@hotmail.com (hereinafter the "hotmail address"). BAI had previously used that e-mail address, as well as other forms of communication, to contact the SAC Boston U/C Company regarding the purchase of various defense articles, some of which are listed on the United States Munitions List, and the export of which is controlled by the U.S. Department of State ("DOS"). In the March 25, 2004 e-mail, BAI requested thirty pieces of the following product: VTU5192A7A or VTV5192A7A. BAI further wrote that more information could be found about the above-referenced product on the internet web site: www.cpii.com. Publicly available information has revealed that www.cpii.com is the corporate internet address for Communication and Power Industries M.P. ("CPI"), Hansen Way, Palo Alto, CA 94303.

2.  On March 30, 2004, BAI contacted the SAC Boston U/C Company via BAI's e-mail address lucky@963.net (hereinafter, the "963.net address"). BAI requested an update on his inquiry of the CPI product, VTU5192A7A. Information received from the manufacturer indicates that the product listed above, the VTU5192A7A, is a "multi octave" traveling wave tube (TWT). The manufacturer further stated that the product is listed on the Munitions List in Category XI(c), and is controlled

for export by the U.S. Department of State. A review of the Automated Export System revealed that Communications and Power Industries is registered with the DOS Directorate of Defense Trade Control ("DDTC") as a manufacturer and/or exporter of defense articles. A review of DOS-issued export licenses issued to CPI revealed numerous export licenses for the export of TWTs.

3.    On April 5, 2004, the SAC Boston U/C Company contacted BAI at the 963.net address. An ICE Special Agent working in an undercover capacity ("UCA 1") stated that he would research the CPI product and provide a sale and delivery quote shortly.

4.    On April 7, 2004, the SAC Boston U/C Company contacted BAI via the 963.net address and sent a copy to his hotmail address. UCA 1 stated that the price per unit on the CPI product, the VTU-5192A7A, would be $40,975.00 per unit for a total of $1,229,250.00.

5.    On April 8, 2004, BAI contacted the SAC Boston U/C Company via the 963.net address. BAI stated that the quoted price for the CPI product was too high and asked if it could be reduced by 25%. BAI further stated that they would be purchasing 50 pieces.

6.    Also on April 8, 2004, UCA 1 contacted BAI via the 963.net address. In this e-mail, UCA 1 wrote that BAI's customer's requested price of $20,000.00 per unit was far below the price for which CPI was currently marketing the product. UCA 1 wrote that he could reduce the price per unit to $35,000.00 per unit. UCA 1 further wrote that "as with the other items we have discussed, approvals will not

be granted to export these items to Mainland China. Delivery of these items (CPI TWTs) would be in the same manner as that of the Vicor products, payable upon delivery in the U.S." UCA 1 further wrote that the first shipment of Vicor products previously ordered by BAI on February 10, 2004 would be ready for delivery during the week of April 19, 2004. The "Vicor products" consisted of a shipment of direct current/direct current military power converters manufactured by Vicor Corporation. The Vicor Products ordered by BAI are also listed on the United States Munitions List.

7.      During prior negotiations regarding the Vicor products, the SAC Boston U/C Company had been informed that the Vicor products would be received by Defendant ZHU Zhaoxin, the President and General Manager of Hong Kong New Crystal International Company, Ltd. Hong Kong New Crystal International Company, Ltd. is located at 2/F No. 16 Shantong New Village Tai Pont, Kowlong, Hong Kong and at Seg Plaza, Shenzhen, Guangdong Province, P.R.C. ZHU was to be accompanied by Defendant John CHU of Pasadena, California who was to translate between Mandarin Chinese and English. An ICE Special Agent working in an undercover capacity ("UCA 2") had previously met ZHU and CHU in Boston on February 9, 2004 as part of the negotiations for the Vicor products.

8.      On April 14, 2004, UCA 2 contacted BAI at the 963.net address. UCA 2 wrote that he had spoken to CHU regarding delivery of the Vicor products. UCA 2 further stated that due to the size of the CPI order, he could reduce the price per

unit to $32,000.00.

9.   On April 15, 2004, UCA 2 contacted CHU at telephone number 626-437-2370.
The phone call was recorded, and UCA 2 recognized the voice as CHU. CHU
stated that when he arrived in Boston, he would rent a car. CHU stated that he
was traveling to Boston to check on the Vicor products, and that after he checked
on the products, he would call BAI and have the final payment for the Vicor
products wired to the SAC Boston U/C company bank account. CHU stated that
this would be done the same way it had been done the last time. CHU
acknowledged that the Vicor order was "sensitive". UCA 2 stated that due to the
sensitivity of the products, the future sales would have to be completed in the
same manner, as a domestic sale, and that CHU and ZHU would handle the
export. CHU further stated that he would rent a motel in the area to wait while
the money was wired from BAI and ZHU.

10.   During the April 15, 2004 telephone call, CHU stated that he did not know if
ZHU would be traveling to the U.S. for this meeting. CHU stated that he would
inspect the Vicor products, and upon inspection, CHU would contact BAI in Hong
Kong to request that final payment be wired as it had been before. CHU then
stated that when the final payment was made, he, CHU, would pick up the Vicor
products. UCA 2 stated that BAI had requested quotes on other products,
including the CPI TWTs. CHU acknowledged that the TWTs were very sensitive
items.

11.   On April 16, 2004, UCA 1 contacted BAI via the 963.net address. UCA 1

-5-

discussed the price of the CPI part number VTU-5192A7A, and confirmed that the price per unit was $32,000.00. UCA 1 further wrote that the manufacturer currently had two units in stock. UCA 1 further wrote that, with respect to the final payment for the Vicor products, it would be best if the funds were not transferred from Mainland China, as that might increase scrutiny of the sale of the items.

12.  On April 19, 2004, BAI contacted the SAC Boston U/C company via the 963.net address. BAI wrote that he had instructed CHU to inspect the parts on April 20, 2004. BAI further requested that the TWT project not be discussed with CHU. BAI further wrote that, regarding the TWTs, "we" can buy the stock.

13.  On April 20, 2004, UCA 2 met with CHU at an office in Cambridge, Massachusetts. The meeting was consensually monitored and recorded. During the meeting, CHU inspected four boxes of Vicor products, and compared the product against an e-mail he had in his possession. CHU examined each box, and counted the product contained within. While inspecting the Vicor products, CHU stated he had spoken to BAI the previous day. CHU stated that after he had completed inspection of the Vicor parts, he would call ZHU/BAI, and they (who UCA 2 understood to refer to BAI and ZHU) would wire the final payment. CHU said it would take approximately 48 hours for the funds to be transferred. CHU placed markings on the Vicor boxes to prevent anyone from opening the boxes following his inspection.

14.  UCA 2 and CHU departed the office complex, and walked to the MC² Restaurant,

located in the Marriott Hotel, Cambridge, Massachusetts. During the lunch

meeting, CHU stated that he had not spoken to ZHU for five days. CHU stated

that he would ship the Vicor products through Central America, claiming that it

was easy. UCA 2 stated that he would like to speak with ZHU about the details of

the export, and that he was concerned about shipping the items on an aircraft.

CHU stated that, if it were his choice, he would not ship the items via air. UCA 2

asked CHU if he would ship the Vicor products directly to the P.R.C., or to Hong

Kong first. CHU stated that he would send the items to Hong Kong first. UCA 2

stated that CHU's biggest responsibility was not to get caught. CHU stated that

30 people worked for ZHU's company in Mainland China, and only a few people

in Hong Kong. CHU stated that he would look into diverting the shipment

through the Philippines.

15.    During the lunch meeting, CHU also stated that he had to return to the office to

further mark the boxes. CHU stated to UCA 2 that he could bring additional

customers to UCA 2 that ZHU did not have. CHU stated that he would be very

careful with the Vicor sale. CHU stated that ZHU's company has a very good

relationship with the Chinese government. CHU acknowledged that he is paid a

commission and minimum salary by ZHU. CHU stated that the competition is

tough, and that there are a lot of people engaged in this kind of business. UCA 2

and CHU departed the restaurant to return to the office to mark and seal the boxes.

CHU then departed the office.

16.    Later on April 20, 2004, BAI contacted the SAC Boston U/C company via the

963.net address. BAI wrote that he would arrange payment for the Vicor parts. BAI asked if it was safe to wire the payment directly from the Hong Kong account. Later on April 21, 2004, BAI contacted the SAC Boston U/C company via the 963.net address. BAI wrote that the money would be wired from a Hong Kong personal account. BAI further wrote that he thought that this would be safe for UCA 2. BAI wrote that his customer had placed the order for the TWTs, but needed the price reduced to $30,000.00 per unit.

17.  On April 21, 2004, BAI contacted the SAC Boston U/C company via the 963.net address. BAI requested the SAC Boston U/C company banking information, and said he would wire the payment "next Monday". BAI further requested a product data sheet for the TWT VTU5192A7A.

18.  Also on April 21, 2004, UCA 1 contacted BAI via the 963.net address. UCA 1 confirmed with BAI that CHU had successfully inspected the Vicor parts. UCA 1 confirmed the SAC Boston U/C company's banking information with BAI. UCA 1 further wrote that as BAI had requested, the TWT sale had not been discussed with CHU. UCA 1 further wrote that he could meet BAI's requested price of $30,000.00 per unit on the TWTs. UCA 1 forwarded the product specifications for the VTU-5192A7A TWT.

19.  On April 26, 2004, CHU contacted UCA 2 on the SAC Boston U/C company telephone. The phone call was recorded, and UCA 2 recognized the voice as CHU. CHU stated that he had spoken to ZHU, and that ZHU was going to wire the money right away. CHU stated that it would probably take 48 hours for the

-8-

money to be wired. CHU further stated that ZHU would speak with UCA 2 on the next sale. CHU stated that at the end of the year, the market may open, so that they only had one year for "this type" of deal. CHU stated that ZHU would probably not come, CHU stated that he would pick up the product himself, and that on next sale, he and ZHU would visit UCA 2. CHU stated that ZHU could not get a visa right now. Subsequently, UCA 2 confirmed with DOS that in fact, ZHU already had a valid visitor's visa.

20.    Also on April 26, 2004, BAI contacted the SAC Boston U/C company via the 963.net address. BAI wrote that he would wire the payment (for the Vicor products) shortly. BAI further wrote that he had received the data sheets for the TWTs. BAI stated that he had an agreement from the customer for 30 "pcs", and would place the order after receipt of the Vicor parts. BAI further requested that UCA 2 keep the "3 pcs" he had on hold, and that "we" will take them soon. BAI further wrote that if everything goes well, he had a lot of business. BAI stated that after he wired the payment, he would fax the bank receipt.

21.    On April 27, 2004, UCA 1 contacted BAI via the 963.net address. UCA 1 acknowledged that BAI's customer wished to purchase 30 "pcs" of the TWT. UCA 1 clarified that the manufacturer currently had 2, not 3, "pcs" in stock . UCA 1 requested BAI to forward a purchase order along with a 10% down payment for the TWTs. UCA 1 further wrote that as the TWTs are "sensitive" items like the Vicor parts, the TWTs would be delivered in the same manner as the Vicor parts, that is, domestically in the United States. UCA 1 asked that if he

was not able to discuss the TWT sale with CHU, how he was to proceed with the inspection and delivery of the TWTs.

22.  On April 29, 2004, UCA 2 contacted BAI via telephone number 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-2562428.  The individual on the receiving end of the call identified himself as BAI, and UCA 2 understood him to be the same person he had previously spoken to by telephone.  An audio recording was made of the telephone call.  BAI stated that he would be transferring $57,000.00 that day as half of the final payment (for the first Vicor shipment), and that on May 2, 2004, the final payment would be sent.  BAI indicated that final payment for the Vicor products was going to be split in half, in order to minimize scrutiny by authorities.  BAI further stated that he would be sending a deposit for the TWT sale in the amount of $6,000.00, also on May 2, 2004.  BAI further requested that he wanted 10 pieces immediately.  BAI further requested that UCA 2 have 2 pieces of the TWT, and that he would order an additional 10 pieces to make the total quantity of the order 40 pieces (of TWT).  BAI further stated that he did not want UCA 2 to speak with CHU about the TWTs, and that ZHU would contact UCA 2 about the sale of the TWTs.  UCA 2 asked BAI if ZHU would meet with him (UCA 2), and BAI stated that ZHU would send an interpreter.  BAI indicated that ZHU would be sending "a couple of guys" to contact UCA 2 to "handle this business".  BAI stated that a person would contact UCA 2 the following week.  UCA 2 requested contact information for the person who would accompany ZHU, and BAI stated that the person would contact UCA 2 the following week.  BAI stated that his boss, ZHU, was the person who

-10-

was requesting the TWTs, and BAI further requested delivery dates in separate lot amounts of 10 pieces.

23.    Also on April 29, 2004, BAI contacted the SAC Boston U/C company via the 963.net address. BAI wrote that he had wired half of the balance for the Vicor products, that is, $57,050.00. BAI further wrote that he would fax a bank receipt reflecting the payment to the SAC Boston U/C company. BAI further wrote that "we" would make a final transfer of payment on May 2, 2004, together with the down payment for the 2 pieces of the TWTs.    BAI further wrote that following the first shipment of the Vicor products, he would purchase "a lot" of Vicor parts. BAI further wrote that "we" would purchase 40 pieces of the TWT (part number) VTU-5192A7A. BAI further requested that the first 2 pieces of TWTs be made ready for shipment.

24.    Also on April 29, 2004, based on product specifications submitted to ICE's Exodus Command Center, License Determination 04-114-01 determined that the CPI part number VTU-5192A7A, a pulsed traveling-wave tube amplifier, is listed on the United States Munitions List, Category XI (c), and therefore is controlled for export by the U.S. Department of State, and requires an export license. As such, CPI part number VTU-5192A7A cannot be exported to the P.R.C., which is an embargoed country for export of Munitions List defense articles.

25.    Also on April 29, 2004, BAI contacted the SAC Boston U/C company via the 963.net address. BAI wrote that "in view of our future cooperation, Mr. ZHU will pay a visit to you around May 4, 2004." BAI further asked, "Do you think the

-11-

situation is good enough for Mr. ZHU to visit USA? Please confirm w(h)ether it

is safe enough for Mr. ZHU to visit you at this time. If yes, please confirm."

26.    Also on April 29, 2004, the SAC Boston U/C company contacted BAI at the

963.net address. UCA 1 wrote that he had not received the first half of the final

payment as of that afternoon. UCA 1 further wrote that he felt it was safe for

ZHU to visit Boston the following week. UCA 1 further wrote that he was

concerned that additional people would be involved in these sales, and further that

these people must understand the sensitivity of the sales. UCA 1 wrote that if he

were to receive the down payment for the CPI TWTs soon, he could have the two

sample units ready for ZHU's inspection next week. UCA 1 further requested a

purchase order be submitted from BAI for the entire order of 40 pieces of TWTs.

27.    On May 3, 2004, UCA 2 contacted BAI at telephone number 011 86 1380 256

2428. The individual on the receiving end of the phone call identified himself as

BAI, and UCA 2 understood him to be the same person he had spoken to by

telephone on previous occasions. The phone call was recorded. BAI asked if

UCA 2 had met ZHU. BAI stated that ZHU was traveling to see UCA 2, and that

he had already left. BAI stated that ZHU had been told to meet UCA 2 on either

May 6 or 7, 2004, and that he (ZHU) would be in Boston at that time. BAI stated

that CHU would probably be traveling with ZHU. BAI stated that the deposit for

the TWTs had not been sent yet, and stated that his boss would talk about the

TWTs with UCA 2.

28.    Later on May 3, 2004, UCA 2 attempted to contact CHU at telephone number

-12-

626-437-2370, but that call went directly to CHU's voice mail. The phone call was recorded. UCA 2 left a message confirming that he would be able to meet with CHU and ZHU on the following Thursday, and Friday (May 6 and 7, 2004).

29. Later on May 3, 2004, CHU contacted UCA 2 via the SAC Boston U/C company cellular telephone. The phone call was recorded, and UCA 2 recognized the voice as CHU. CHU stated that ZHU had CHU's cellular telephone. UCA 2 stated that he had sent a fax to number 626-300-8188, and CHU stated that he had not gone to the office that day. CHU said that ZHU was going to an exhibition in Boston on May 4 - 6, 2004. CHU asked if UCA 2 could meet on Wednesday, May 5, 2004. UCA 2 stated that it would be better to meet on Thursday May 6, 2004. CHU stated that Thursday would be fine. CHU stated that he would make travel arrangements and then would give that information to UCA 2. CHU stated that he and ZHU would like to stay in a hotel near the airport. UCA 2 stated that he would try to make reservations at a hotel for him. CHU stated that he was going to the NEPCON East trade show in Boston. CHU stated that they would try to make arrangements to travel into Boston for Wednesday, May 5, 2004, and they would be leaving on Thursday (May 6). CHU gave UCA 2 a second fax number, 626-798-9546. UCA 2 stated that he had received the payment for the sale of the Vicor shipment. UCA 2 asked CHU how he would pay for shipping of the Vicor products, and advised that CHU should pay for the shipping charges with cash.

30. On May 4, 2004, UCA 2 contacted BAI via the 963.net address. UCA 2 wrote that he had received the final payment in the amount of $57,032.00. UCA 2

-13-

further wrote that he had confirmed with CHU that CHU and ZHU would be arriving in Boston on Wednesday, and that he (UCA 2) would pick up ZHU and CHU at the airport on Wednesday morning.

31. Also on May 4, 2004, UCA 2 faxed the following message to telephone numbers 626-300-8188 and 626-798-9546. UCA 2 wrote that he had received the wire transfer of $57,032.00 representing the final payment for the Vicor shipment. UCA 2 further requested that CHU advise him (UCA 2) what his travel plans were so that he could pick CHU and ZHU up at the airport.

32. Also on May 4, 2004, UCA 2 contacted BAI via the 963.net address. UCA 2 wrote that he had received the final payment for the Vicor products in the amount of $57,032.00. UCA 2 further wrote that he had spoken with CHU the previous evening, and had confirmed that ZHU and CHU would be arriving in Boston on Wednesday, May 5, 2004. UCA 2 further wrote that he would pick up ZHU and CHU at the airport. UCA 2 wrote that he would be meeting with CHU and ZHU on Thursday, and that BAI's previous instructions were not to discuss the TWT sale with CHU. UCA 2 then asked that since CHU would be traveling with ZHU, whether it was okay to discuss the details of the TWT sale with both CHU and ZHU.

33. On May 5, 2004, UCA 2 picked up ZHU and CHU at Logan International Airport, and drove them to their hotel.

34. Also on May 5, 2004, BAI contacted the SAC Boston U/C company via the 963.net address. BAI wrote that he had contacted ZHU, and that it was no

-14-

problem to talk about the TWT with both ZHU and CHU. BAI further wrote that UCA 2 could feel free to discuss it with them.

35.     Also on May 5, 2004, UCA 2 contacted BAI via telephone number 011-86-13-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. The phone call was recorded, the person on the receiving end of the call identified himself as BAI, and UCA 2 understood him to be the same person he had previously spoken to by telephone. UCA 2 advised BAI that he had picked up ZHU and CHU, and that one TWT was received from the manufacturer. UCA 2 further asked BAI if he could speak with ZHU and CHU about the TWTs.

36.     Also on May 5, 2004, BAI contacted the SAC Boston U/C company via the 963.net address. BAI wrote that he had contacted ZHU, and that it was no problem to talk about the TWT with both ZHU and CHU. BAI further wrote that UCA 2 could feel free to discuss it with them.

37.     Also on May 5, 2004, BAI contacted UCA 2 on the SAC Boston U/C company telephone. The phone call was recorded, the caller identified himself as BAI, and UCA 2 recognized the voice as the person he previously spoke to by telephone understanding him to be BAI. BAI stated that he had spoken with ZHU, and that there was no problem speaking with ZHU and CHU about the TWTs. UCA 2 stated that he had received the TWT from the manufacturer and he would bring it to the meeting with ZHU and CHU. UCA 2 asked about the $6,000.00 deposit, and BAI stated that this would be placed at the proper time. UCA 2 stated that he had two units on hold and he needed a deposit. BAI stated that it was not a good time because he (ZHU) was in the United States now. BAI further stated that only

-15-

two units was not good, because they are difficult to ship out. BAI said he wanted

to ship ten units at a time, because it takes a special effort to do it. UCA 2 stated

he could contact the manufacturer about eight more pieces, and he requested a

purchase order from BAI. BAI stated he could provide that after he returned to

the office from vacation on May 8, 2004. BAI also stated that UCA 2 could also

discuss with ZHU what would be a good time to place the purchase order, and that

maybe he would place the order after ZHU left the United States.

38.    On May 6, 2004, UCA 2 met CHU in Cambridge, Massachusetts. CHU accepted

delivery of the Vicor military power converters. UCA 2 provided CHU with an

inoperable TWT manufactured by CPI for ZHU's inspection. CHU advised that

he and UCA 2 were to meet with ZHU at a hotel. CHU then loaded the Vicor

products into his rental vehicle, along with the TWT.

39.    UCA 2 and CHU proceeded to the Marriott Hotel in Cambridge, Massachusetts,

where they picked up ZHU. CHU stated that they would meet over lunch. UCA 2

suggested that they go to Jimmy's Harborside Restaurant in South Boston. UCA

2 outlined that he had made contact with BAI regarding the purchase of the

TWTs. UCA 2 pointed out the sample TWT he had made available for ZHU to

inspect. CHU, who interpreted for ZHU, told UCA 2 that they would discuss the

TWT order at the meeting over lunch. UCA 2 outlined the discussions he had had

with BAI regarding the purchase of TWTs, and the fact that two were available

immediately. CHU said that for security reasons, they would "watch this one.

Then, when we leave, we'll place order." CHU further stated that "when we go

-16-

back, I'll tell you." UCA 2 stated that the TWTs needed a State Department export license, and that one couldn't be obtained for China. CHU mentioned to ZHU in Chinese that he was afraid of being tape recorded during the meeting. CHU asked UCA 2 if he had two TWT units available in Boston. UCA 2 replied that only one was in Boston; he said that the manufacturer had one other.

40.    When UCA 2, ZHU and CHU arrived at the parking lot outside Jimmy's Harborside Restaurant, CHU opened the rear door of the rental vehicle, and CHU then opened the box containing the TWT. ZHU visually inspected it, asked in what year it was manufactured, and recorded the model number and other information from the labeling on the TWT onto a slip of paper. ZHU also asked UCA 2 if the TWT was used, to which UCA 2 replied that it was new and taken from stock.

41.    UCA 2 then returned the TWT to its box, and placed it back in the rental vehicle. The three men then entered the restaurant. They proceeded to the second floor dining area, and were seated by a window. UCA 2 reiterated the discussions and e-mail correspondence he had had with BAI regarding the purchase of TWTs. UCA 2 advised ZHU and CHU that, similar to the Vicor products, these items were restricted, and required a DOS license to export. UCA 2 advised them that they could not get such a license to export the TWTs to China.

42.    UCA 2 reviewed with ZHU and CHU that the agreed-upon price was $30,000.00 per unit, and that the total quantity was 40 units. UCA 2 told ZHU and CHU that the standard delivery is 180 days from the date the order is placed, and that UCA

-17-

2 would need to advise the manufacturer and get a deposit if ZHU and CHU wanted to take the two units available at present. UCA 2 also stated that the time from order to delivery could be expedited if they were willing to pay a premium. After some discussion, which included consideration of two scheduled deliveries of 20 units each, ZHU and CHU settled on a schedule anticipating four deliveries of ten units each. CHU, in concert with ZHU, hand wrote a delivery schedule, indicating how they wanted the delivery of the forty TWTs distributed. ZHU and CHU wanted ten units ordered in May, and an additional ten units ordered once every other month for the following six months.

43.    ZHU and CHU acknowledged that delivery of the TWTs would be handled in the same fashion as the delivery of the Vicor products; that is, that UCA 2 would make a domestic sale in the United States. ZHU and CHU insisted that the sale not reflect a sale to their company in Los Angeles. Rather, ZHU and CHU told UCA 2 that he needed to figure out a way of getting the TWTs to them without providing any information which could tie the sales to them. ZHU and CHU agreed that it would then be their responsibility to get the TWTs out of the United States. UCA 2 expressed concern that these items were larger than the Vicor products, and therefore more difficult to conceal. UCA 2 pressed ZHU and CHU for specifics as to how they could accomplish that concealment without getting caught. UCA 2 also advised that shipping the TWTs by air would be risky. ZHU and CHU did not give specifics as to how they would accomplish the export of the TWTs, but assured UCA 2 that they would take care of it. ZHU and CHU each

-18-

mentioned that a number of people had been caught conducting such transactions. ZHU indicated that only he, CHU and BAI were privy to the TWT transaction. UCA 2 stated that it was good to minimize the number of people who were aware of the transaction, and that only he and UCA 1 were aware of it from their side. UCA 2 further stated that BAI had indicated that ZHU and an unidentified individual would be meeting with UCA 2 about the sale of the TWTs, and that UCA 2 was happy that no other individual had been introduced into the transaction. ZHU, through CHU, asked UCA 2 if he wanted to receive the payment for the TWTs in cash. UCA 2 said that he thought that would be better for all parties.

44.    UCA 2 advised ZHU and CHU that if they wished to purchase the two TWTs currently available, he would need $6,000.00, representing a 10% down payment for those two units. UCA 2 stated he would permit them to apply $6,000.00 of the payment for the Vicor products as the down payment in order to hold the TWTs for ZHU and CHU. ZHU and CHU agreed to that arrangement.

45.    As UCA 2, ZHU and CHU left the restaurant parking lot in the rental vehicle, UCA 2 was recapitulating the terms of the agreement, and said, "So tomorrow I'll get a purchase order," and also asked how they were going to pay for the deposit. CHU said that they would wire the money tomorrow. UCA 2 indicated toward ZHU and said "cash." In Chinese, ZHU said to CHU that they were going to wire the money from Hong Kong. UCA 2 said that he would contact the manufacturer to ask them to hold onto the two TWTs. CHU said, "I'll tell you tomorrow."

UCA 2 said, "Should I expect the money from Sunny [BAI] or should I expect it

from L.A.?"  CHU said "Sunny."

All in violation of 18 U.S.C. § 371.


A TRUE BILL


FOREPERSON OF THE GRAND JURY


ASSISTANT U.S. ATTORNEY


DISTRICT OF MASSACHUSETTS; May 18, 2004.  @ 3:15 PM

Returned into the District Court by the Grand Jurors and filed.


DEPUTY CLERK